# Wytheville

SAMUEL B. WHITE AND OTHERS V. COMMONWEALTH
OF VIRGINIA, WHO SUES, ETC.

June 16, 1932.

Present, Campbell, C. J., and Holt, Epes, Gregory and Chinn, JJ.

The opinion states the case.

*Warner Ames, Stewart K. Powell* and *Gunter & Gunter*, for the plaintiff in error.

*George L. Doughty, Jr.,* and *J. Brooks Mapp,* for the defendants in error.

HOLT, J., delivered the opinion of the court.

Gladys M. McCready, for whose use and benefit this action was brought, and who was a depositor in the Farmers Bank of Oak Hall, Incorporated, has recovered a judgment against the makers of a certain bond executed by the directors of that institution. That judgment is now before us on a writ of error. The parties will be designated as they were in the trial court.

F. B. Richardson, chief bank examiner, about the first of January, 1922, found that the bank appeared to be indebted, for money borrowed, in something over $34,000.00 (as a matter of fact it was $81,600.00), for which it had pledged as collateral $58,000.00 in bonds and bills receivable. He was not satisfied with the situation even as he found it. In his judgment such borrowing by a bank whose capital stock was only $15,000.00 indicated unsound methods. He was unwilling that business should go on, and so at his instance this bond which he prepared, was executed by the bank's directors:

"Know all men by these presents that the undersigned, in consideration of the sum of $10.00 paid to them at and before the signing, ensealing and delivery of these presents, the receipt whereof is hereby acknowledged, are held and firmly bound unto the Commonwealth of Virginia in the full sum of seventy-five thousand dollars ($75,000.00), for the payment of which well and truly to be made we bind ourselves, jointly and severally, our heirs, executors, administrators and assigns, firmly by these presents, and we

do hereby waive the benefit of our homestead exemption as to this debt, obligation or undertaking.

"The condition of the above obligation is such that, whereas it has been necessary for the Farmers Bank of Oak Hall, Horsey, Virginia, to borrow from time to time a sum in excess of thirty-four thousand dollars ($34,000.00), and it may be necessary to borrow additional amounts from time to time in the future, as the gradual decline in the deposits of this bank have not been offset by new deposits, and in order to borrow these funds it has been necessary to pledge the bank's bills receivable and bonds to an amount exceeding fifty-eight thousand dollars and it will be necessary when additional funds are borrowed to pledge further its bills receivable and bonds, thus leaving the bank owing its depositors more than seventy-five thousand dollars, and not having assets under its control sufficient to offset such liability; and whereas, among its bonds and bills receivable there are certain to be losses which at the present time cannot be definitely determined; and whereas, the obligors herein, being the officers and directors of the said Farmers Bank of Oak Hall, Horsey, Virginia, and charged with the proper administration of the business of the said bank and the protection of its depositors, desire to continue in business, believing that they can safely do so, are at the same time desirous of guaranteeing to the several depositors of the said Farmers Bank of Oak Hall, Horsey, Virginia, the solvency of that institution and the payment in due course of all of its deposits whenever demand therefor shall be made;

"Now, therefore, if the obligors herein will indemnify and save harmless all of the depositors of the said Farmers Bank of Oak Hall, Horsey, Virginia, against loss by reason of the inability of the said bank to meet its obligations whenever demand therefor shall be made, then this obligation to be void, otherwise to remain in full force and virtue.

"And the said obligors hereby expressly agree that in

case of a breach of the foregoing condition, that the depositors, either all or any number of them, shall have a joint or separate right of action hereunder, at their election, in the name of the Commonwealth of Virginia, for their use and benefit.

"Witness the following signatures and seals at Horsey, Virginia, this 3rd day of January, 1922.

| | |
|---|---|
| "Samuel B. White" | (Seal) |
| "L. Y. Thornton" | (Seal) |
| "Martin Hall" | (Seal) |
| "Donald F. Fletcher" | (Seal) |
| "O. R. Fletcher" | (Seal) |
| "R. R. Nevitte" | (Seal) |
| "Geo. T. Corbin" | (Seal) |
| "H. R. Revell | (Seal)" |

It is true that there was no statute which authorized the Banking Department to demand the execution of this bond—certainly none which in terms conferred that power—but when the State Corporation Commission, after such an examination, finds that the banking laws of the State are not being fully observed, or that there are any irregularities practiced, or that there is danger of impairment of capital, it may give notice and ask for the appointment of a receiver, and it may, when deemed necessary for public interests, at once close the doors of any bank without notice. Code, section 4121, now section 4149 (52).

The directors, in this instance, were desirous of continuing business, and so at their election they were permitted to do so, provided they were willing to pledge their personal credit. Of course they were not obliged to make any such pledge, but there was no reason why they should not have been permitted to make it, and they did make it in furtherance of what they then believed was their own interest.

No real permanent improvement followed. Milton E. Lang, cashier, died in March, 1927. Four days later the

bank was closed and J. Merritt Chandler was appointed receiver, and has admittedly discharged his duties well. He took over its assets, among which was the bond in judgment. Deposits were then $83,641.83. He ascertained that overdrafts amounted to $23,905.22, of which $23,143.95 were the overdrafts of James H. Hartman and Mary T. Hartman, his wife. Mr. Hartman's overdrafts began in 1922. Those made by his wife began in 1924. They gradually increased up to the close of business and were not generally known; indeed, so far as the record shows, knowledge was confined to the cashier. Mr. M. E. Bristow, Commissioner of Insurance and Banking, gives this reason for his failure to uncover them: "The sheets showing these overdrafts were not in their proper place at the time, not in the ledger." Nothing has been paid on them and they are probably worthless.

When Mr. Chandler, the receiver, qualified there was due, as we have seen, to depositors $83,641.83. He has paid to them 75 per cent of their claim, and will probably be able to make another distribution of 2 per cent. There was still due them, as of June 1, 1931, $20,882.62. He has on hand the Hartman overdrafts, and claims made up of chips and whetstones, in amount $11,174.33, also worthless.

From this it appears that but for the Hartman overdrafts the bank, when it went out of business, would have been able to pay its debts, but its stockholders' equity had been wiped out. The jury has found that it was insolvent from the date of the bond to the date of its failure. Captain Frank Marshall testified that he was elected director in 1925, and served as such for two years, and resigned because he thought it was insolvent, and that in his judgment it was insolvent when he went into office.

On December 21, 1926, Mrs. McCready made a deposit of $2,500.00, which was put on savings account, and was still to the credit of that account when the bank failed.

She has been paid by the receiver $1,875.00, and it was for the balance due that this action was brought.

These are the assignments of error:

"1.   The refusal of the court to permit the petitioners to introduce certain evidence.

"2.   The refusal of the court to give instructions 1 and 3 asked for by the defendants, to be found in certificate of exception No. 3.

"3.   The giving by the court of instruction B asked for by plaintiff, to be found in certificate of exception No. 2.

"4.   Said verdict is contrary to the law and the evidence, because the verdict is against the weight of the evidence.

"5.   Motion in arrest of judgment because the consideration of the bond sued on is illegal, the defendants having been required to execute the same, said bond not having been provided for by the statute and being in contravention of the statute in such case made and provided."

Under the first assignment, plaintiff's contention, as we understand it, is that the bond in judgment was given to cover only excess borrowing, believed to have been about $34,000.00, and possibly deposits made before that particular indebtedness had been paid.

George T. Corbin, one of its makers, if permitted, would have testified as follows:

"Q.   Were you told that it was not to be a permanent bond?

"A.   Yes, sir.   As soon as the excess borrowings were taken care of the bond was to be released and returned back to us."

Donald F. Fletcher, another maker, would have said:

"Q.   State whether or not you recall anything that was said, by any of the parties who signed, to Mr. Richardson about the object of the bond, what it was intended to cover?

"A.   Well, it was generally understood by the directors themselves who were present when it was told by Mr.

Richardson that the bond was to be delivered back to us when our borrowings had been brought down, the excess money that we had borrowed, was paid back."

Additional testimony of like character was tendered, but the court refused to permit any of it to go to the jury.

In support of this contention we are cited to many cases which lay down the fundamental rule, not here questioned, that in the construction of contracts we must look to the intentions of the parties, among which are *Talbott* v. *Richmond & Danville R. R. Co.*, 31 Gratt. (72 Va.) 685; *Chesapeake & P. Tel. Co.* v. *Wythe Mut. Tel. Co.*, 142 Va. 529, 129 S. E. 389, 392; *Chesapeake & Ohio Canal Co.* v. *Hill*, 15 Wall. 94, 21 L. Ed. 64; but it is equally fundamental that there must be something to construe. "The province of construction lies wholly within the domain of ambiguity." *Hamilton* v. *Rathbone*, 175 U. S. 414, 20 S. Ct. 155, 158, 44 L. Ed. 219; *Kennard* v. *Travelers' Protective Ass'n*, 157 Va. 153, 160 S. E. 38.

"While the court, in construing a contract, may take into view the circumstances under which it was made, yet when a breach of it is averred its language must determine to what the parties to it bound themselves. Courts are not authorized to make contracts for them or to add to any stipulation which they have not seen proper to insert." *Stonega Coal & Coke Co.* v. *Louisville & N. R. R. Co.*, 106 Va. 223, 55 S. E. 551, 552, 9 L. R. A. (N. S.) 1184.

"The general principle that evidence of a contemporaneous parol agreement is not admissable to vary or contradict the terms of a valid written instrument, except in cases of fraud or mistake, is so familiar and well established that citation of authority in its support would seem to be superfluous. It is a principle founded in wisdom, and cannot be too carefully guarded. Upon its enforcement the certainty and sanctity of written contracts depend, and its violation would be destructive of the most solemn trans-

actions of life. This court has so often, in elaborate opinions, discussed this subject, and adhered without variation to the rule of evidence adverted to, as an established axiom of our jurisprudence, that nothing further can be added without useless repetition." *Slaughter* v. *Smither*, 97 Va. 202, 33 S. E. 544. See also, *Lynnhaven Beach & Park Co.* v. *Moore*, 156 Va. 683, 158 S. E. 896; 2 Williston on Contracts, section 810.

Other cases to the same effect without number might be cited. They serve but to reaffirm the hoary rule which forbids the use of parol evidence to alter, vary, or contradict, the terms of a written instrument.

The bond, in terms too plain to be misunderstood even by the most captious of critics, tells us that its makers were desirous of guaranteeing to the depositors the solvency of that bank and the payment in due course to them of their deposits upon demand. The defendants would now have us take from them this right so plainly written, and argue with earnestness that to do so would leave their written promise intact. Such a claim is wholly untenable.

It is also claimed that it was delivered on condition, the condition being that it should be returned when the $34,000.00 debt had been paid, and that in no event were those who deposited thereafter protected.

It is true that the old rule of finality from delivery of an instrument under seal has broken down, and that those things may now be done directly which formerly could be accomplished only by the intervention of a third person and by delivery in escrow. A bond complete upon its face may be delivered on condition that it is not to become effective until the happening of some designated event. *Whitaker* v. *Lane*, 128 Va. 317, 104 S. E. 252, 262, 11 A. L. R. 1157; *Harris* v. *Sanford*, 148 Va. 181, 138 S. E. 465, 54 A. L. R. 699. But no case has yet told us that it can be delivered on condition that its maker should not do the very thing

which in it he promised. It is not possible to "vary the legal effect of the language used in the instrument." *Whitaker* v. *Lane, supra.* And so it is not possible to change a promise to protect depositors into a promise to pay money borrowed, or to limit its protection to a certain class of depositors when the bond itself declared that it was for the protection of "all of the depositors."

The Banking Department was not interested in protecting creditors. They were already amply protected by collateral with a face value of $58,000.00. The reason for its execution is written into the bond itself, which, at the risk of repetition, we will restate. Its makers set out the fact that they ·are officers and directors, charged with the proper administration of the business of the bank and with the protection of its depositors, and say that they "desire to continue in business, believing that they can safely do so, are at the same time desirous of guaranteeing to the several depositors of the said Farmers Bank of Oak Hall, Horsey, Virginia, the solvency of that institution and the payment in due course of all of its deposits whenever demand therefor shall be made."

The evidence tendered was incompetent for another reason. This bond was a continuing guaranty, voluntarily made, and could be canceled by its makers at pleasure on notice. *Tischler* v. *Hofheimer*, 83 Va. 35, 4 S. E. 370; *Goodrich Rubber Co.* v. *Fisch*, 141 Va. 261, 127 S. E. 187; *Jordan* v. *Dobbins*, 122 Mass. 168, 23 Am. Rep. 305; *Aitken* v. *Lang's Adm'r*, 106 Ky. 652, 51 S. W. 154, 90 Am. St. Rep. 263; *Saint* v. *Wheeler & Wilson Mfg. Co.*, 95 Ala. 362, 10 So. 539, 36 Am. St. Rep. 210; *Ricketson* v. *Lizotte*, 90 Vt. 386, 98 Atl. 801; *Offord* v. *Davies*, 12 C. B. (N. S.) 748. It was a continuing guaranty for a continuing consideration. While it stood its makers had the unhampered right to continue the operations of their bank. If withdrawn they had to face the possibilities of foreclosure. Having elected

to take under the bond they must abide by its provisions. It is an ordinary case of estoppel by election. *Wray* v. *Davenport,* 79 Va. 26; *Columbia Amusement Co.* v. *Pine Beach Inv. Corp.,* 109 Va. 325, 63 S. E. 1002, 16 Ann. Cas. 1120; *Virginia Beach Dev. Co.* v. *Commonwealth,* 115 Va. 280, 78 S. E. 617.

The next assignment of error is based upon the refusal of the court to give instructions 1 and 3, tendered on behalf of the defendants.

Instruction 1 deals with matters already discussed. It told the jury that they might find for the defendants if they believed that no loss was occasioned depositors by reason of the $34,000.00 borrowed. It, for reasons stated, was properly rejected. No such limitation of guaranty was written into the bond.

Instruction 3 told the jury that they must find for the defendants "if they believe from the evidence that the insolvency of the bank was caused by the peculations of the bank's cashier."

Peculation is the fraudulent misappropriation by one to his own use of money or goods entrusted to his care. Webster's Dictionary. There is no evidence to support this instruction. Certainly the cashier's conduct is not to be commended, but there is nothing to show profit to him out of the transaction.

Assignment 3 is taken to instruction B, given at the instance of the plaintiff. It told the jury that if it believed that the bond in judgment was delivered to the Banking Department of the Commonwealth and held until the bank's failure, and that there was still due to the plaintiff money placed by her on deposit, they must find for her, "unless said jury further believe from the evidence that there was a time between the giving of said bond and the failure of said bank that the same was not solvent." It is stated in the defendants' brief, and not denied, that the clause just

quoted was added by the court at the request of counsel for the defendants. If this be error, they cannot complain; it favors them. This assignment is not well taken.

Next it is said that the verdict is contrary to the law and the evidence and without evidence to support it. These matters have already been considered and passed upon.

Finally it is said that the bond in judgment is illegal and executed without warrant of law. We have seen that under Code, section 4121, the Corporation Commission, acting through its Banking Department, may ask for the appointment of a receiver where the banking laws are not fully observed, where irregularities are practiced, or when capital has been or is in danger of being impaired, and may summarily close the doors of any bank when such an act is deemed necessary for the protection of public interest. Certainly the Banking Department believed that capital was impaired, or in danger of impairment, and that public interests were involved. That conclusion the bank might have contested. That they acquiesced in its justice is made manifest by the fact that they were willing to pledge their personal credit that they might, without a contest, continue in business. The bond itself is payable to the Commonwealth of Virginia. If it had been payable to John Smith, those who were its beneficiaries could sue. See Code, section 5143. It was made, as we have seen, voluntarily and for a continuing consideration. Its makers afterwards asked that it be canceled, but the Banking Department was unwilling to accede to their request— wisely, as subsequent events have amply demonstrated. They, on their part, were unwilling to declare that they would be no longer bound, for they were unwilling to put their bank to the test, and rather preferred to take the chance of continuing operations. They had every reason to believe that upon disclaimer of liability the State would move to close their bank. They made their election and must abide by it.

To the extent that it is possible we desire to uphold the State Corporation Commission in its every effort to protect public interests, but we do not desire to be understood as holding that the taking of such a bond and, upon the strength thereof, permitting an insolvent bank to continue to receive deposits and do a banking business is a proper exercise of the powers of the State Corporation Commission. Nor do we desire to be understood as holding that the existence of a bond such as that under consideration can warrant the directors of a bank in publishing statements of the financial condition of the bank showing an unimpaired capital, if the capital be in fact impaired.

The judgment appealed from must be affirmed. It is so ordered.

*Affirmed.*