# Staunton

JOHN Q. RHODES, JR., RECEIVER, ETC. V. ARTHUR WALTON, AND OTHERS.

September 20, 1934.

Present, Campbell, C. J., and Holt, Epes, Hudgins, Gregory and Browning, JJ.

The opinion states the case.

*W. Earle Crank* and *John Q. Rhodes, Jr.,* for the plaintiff in error.

*George E. Allen* and *H. M. Ratcliffe,* for the defendants in error.

HOLT, J., delivered the opinion of the court.

This is an action instituted by a notice of motion for judgment. It is brought by John Q. Rhodes, in his official capacity as receiver of the State Bank of Columbia, Virginia, against Arthur Walton and the other parties who signed and sealed this bond:

"Know all men by these presents, that we, the under- signed in consideration of the sum of ten dollars ($10) to each of the signatories hereto, the receipt of which by each is hereby acknowledged are held and firmly bound unto The State Bank, Columbia, Virginia, in the just and full sum of twenty-five thousand dollars ($25,000) whereof, each obligor binds himself, severally, his heirs, personal representatives and assigns by this obligation, and hereby each obligor also waives his homestead exemption.

"The condition of this obligation is such that whereas, upon an examination of the said The State Bank, the State Corporation Commission, through its Commissioner of Insurance and Banking, has ascertained that the capital of the said The State Bank, has been or is in danger of being impaired to the extent of twenty-five thousand dollars ($25,-000) more or less, and,

"Whereas, also the obligors herein being officers and directors of the said The State Bank, and as such, being charged with the administration, management and operation of the said The State Bank, and are desirous of guaranteeing and maintaining the safety and solvency of it, and more especially of indemnifying and saving harmless its depositors and other creditors, from any loss or damage resulting from the impairment of its capital or any other

irregularities as aforesaid, do hereby waive notice from the said State Corporation Commission as provided in section 53 of the Virginia Banking Act and covenant and agree with the obligee herein to indemnify and save harmless, any depositor or other creditor of the said The State Bank, against any loss or damage by reason of the impairment of capital or any other irregularities within thirty days after demand made, and agree also that in the event of a breach that suit may be maintained against any one, all or an intermediate number of the obligors herein, according to circumstances without joining all in such suit.

"Now therefore, if each of the said obligors herein shall indemnify, save harmless and make good any loss or damage, resulting from impairment of capital or any other irregularities as aforesaid, within thirty days after demand made, this obligation shall be null and void, otherwise to remain in full force and virtue.

"Witness the following several signatures and seals at Columbia, Virginia, this 14th day of October, 1930.

| | |
|---|---|
| ARTHUR WALTON | (Seal) |
| A. F. MOON, JR. | (Seal) |
| P. N. STONEMAN | (Seal) |
| E. M. JORDAN | (Seal) |
| S. W. SHELTON | (Seal) |
| G. P. HODGSON | (Seal) |
| NASH P. SNEAD | (Seal) |
| C. R. SANDERSON | (Seal)" |

The defendants, upon being required to do so, filed this statement of defense:

"(1) The plaintiff, when properly authorized by the court, of his appointment, is clothed with only such rights of action as might have been maintained by The State Bank, Columbia, Virginia, the equities of the said bank whose right of action the plaintiff purports to represent, are not such as to entitle him to sue and recover from these defendants on the bond set forth in the notice of motion.

"(2) No authority has been conferred upon the plaintiff in his representative capacity as receiver, by the court of his appointment, to prosecute this action.

"(3) The bond sued on was delivered in escrow to the Honorable M. E. Bristow, Chief Examiner of Banks of Virginia, to be delivered to the said bank only in the event of a loss sustained by the bank during the period intervening between the date of the execution of the bond and the date of a contemplated merger of the said The State Bank, Columbia, with the State Bank of Louisa, or, the date of the failure and abandonment of all negotiations for the merger.

"(4) The said The State Bank of Columbia, was closed by the Chief Examiner of Banks before the said merger was effective, and before negotiations for the merger had failed, and while they were still in progress, negotiations having been abandoned only after the closing of the bank. No loss was sustained by the bank between the date of the execution of the said bond and the date of the closing of said bank, and the delivery of the said bond by the said Bank Examiner to the receiver, after the closing of the bank, was in violation of the condition upon which the bond was delivered in escrow, and it was, therefore, never delivered as a completed and binding obligation, and no action will lie thereon."

Defenses, numbered 1 and 2, appear to have been abandoned, and it is upon 3 and 4 that this case turns.

The Bank of Columbia was a State institution whose capital was $20,000. In 1930, if not before, its finances fell upon evil days. It hoped to relieve itself by merger with the Bank of Louisa, and in furtherance of that effort negotiations were begun in July of that year. This effort failed and it was closed by order of Mr. M. E. Bristow, State Commissioner of Banking and Insurance, on December 11, 1930, and Mr. Rhodes was appointed receiver on December 15, following. The bond, which was in the custody of. Mr. Bristow, was sent to him. He made demand without avail and then brought this action. The bank was

hopelessly insolvent, and will pay to its creditors a dividend of somewhere about twenty-five per cent. In October negotiations with the Bank of Louisa were still pending with some promise of success. The Commissioner of Banking was anxious to give such assistance as he could, consistent with his official duties. He suggested that a bond be given in terms which he had indicated. He could not compel the directors to execute it but told them that if they were unwilling to act he would close the bank forthwith. They did express themselves as willing to comply with his demands, and on October 11 an instrument in proper form was sent to Mr. Shelton, together with this letter:

"Richmond, Virginia, October 11, 1930.
"Mr. S. W. Shelton,
"Palmyra, Virginia.

"Dear Mr. Shelton:
"In accordance with my promise there is enclosed a copy of indemnifying bond prepared according to our usual forms for cases like that at Columbia. If any of the directors do not wish to join in the bond that is a matter for them to decide. If a sufficient bond is given us we will be satisfied.
"When executed the bond is to be returned to this office to be held until we feel that the bank's difficulties are over. If all of the directors desire to execute a substantial agreement among themselves apportioning and allotting their liability, this office will have no objection to that course either, but we desire the bond in substantially the same shape as submitted.
"Kindly advise me of your action following the meeting Tuesday.
"Yours very truly,
"M. E. Bristow,
"Commr. of Insurance and Banking."

The bond was signed on October 14, 1930, by all of its makers except Mr. Sanderson. Soon afterwards Mr. Shel-

ton, who had retained it for that purpose, secured his signature and gave or sent it to Mr. Bristow.

In inverse order we will take up defendants' contentions.

It is said that negotiations for merger were still pending when the bond was delivered by Mr. Bristow to Mr. Rhodes.

On November 29th the Louisa bank definitely rejected the Bank of Columbia's proposition and so notified it, and this ended dealings which had been in progress since July. Shelton was asked:

"Was the Bank of Louisa still negotiating with you after November 29th?" and answered, "No, sir. All my negotiations were with these three gentlemen."

These negotiations according to this witness' statement amounted to this: He saw Mr. Rhodes, Mr. Purcell and Mr. Crank, private citizens, who told him that if he could secure the approval of Mr. Crenshaw, who was a majority stockholder in the Louisa bank, the merger would go through, and this is all.

We have no difficulty in reaching the conclusion that the negotiations for merger in progress when the bond was executed were definitely broken on November 29th and were never renewed with the Bank of Louisa at all. And so the claim that the delivery of the bond was premature, in that negotiations were still pending, goes out.

This brings us to a consideration of those conditions, if any, which attached to the bond when it was delivered to Bristow. It is contended, as we have seen, that it was delivered in escrow, and was to be redelivered and used "only in the event of a loss sustained by the bank during the period intervening between the date of the execution of the bond and the date of a contemplated merger of the said The State Bank, Columbia, with the State Bank of Louisa, or, the date of the failure and abandonment of all negotiations for the merger."

It is to be noted *in limine* that any such parol agreement violates the terms of the bond itself. Its controlling purpose was to protect depositors and other creditors, or as it

is there expressed, of "saving harmless its depositors and other creditors."

Mr. Shelton, a maker, was asked to tell what Mr. Bristow required and did. This appears in his direct examination:

"A. Mr. Bristow required the directors of the State Bank to execute a bond in the penalty of $25,000, to be delivered to him, and to be held by him and then used by the bank, if the bank suffered a loss by reason of Mr. Bristow allowing the bank to remain open for a period of time necessary to consummate these merger proceedings.

"Q. Would he permit you to keep the bank open and continue to do business without some bond?

"A. No.

"Q. Did he state that to you in that conference?

"A. Yes, sir."

Upon cross-examination he made somewhat the same statement:

"Mr. Bristow should hold this bond and deliver it to the bank to be enforced if there was any loss during that period, that this merger proceeding was pending."

The bond was to be enforced if there was any loss to the bank while merger negotiations were pending. That is to say, in such a case it might be delivered to Rhodes, receiver, who after demand had the right in its enforcement to take necessary legal action.

Dr. Nash P. Snead, another director, was next examined. This is an excerpt from this cross-examination:

"Q. I understand you to say on direct examination that you understood that you signed this bond and delivered it to Mr. Bristow to cover any loss which might occur between the date of the signing of the bond and the date of the merger or the closing of the bank?

"A. That is true.

"Q. Is that the condition that you signed it under?

"A. Yes, sir."

His understanding could not vary the terms of the bond itself.

Mr. M. E. Jordon, another maker, said in direct examination:

"We were negotiating with the Bank of Louisa. I was not on that committee but at this meeting which we signed the bond they had a letter from the Bank of Louisa setting forth the terms by which they would take us over. It was taken up before this board and passed on. We accepted their terms, and after that we signed the bond, simply to take care of any loss that might be sustained during that period of time."

And further:

"Q. Did Mr. Bristow tell you that the bond was not to be delivered unless a loss was sustained?

"A. I don't know that he did."

Mr. P. N. Stoneman, another maker, was asked in direct examination:

"Q. Suppose the bank suffered no loss during that interval during the period the negotiations were pending, what was to become of the bond?

"A. The bond was to become null and void and be returned, the only answer I could give."

He was asked in cross-examination:

"Q. Where did you get that understanding from, then?

"A. I got it through discussions in the meeting.

"Q. With whom?

"A. Mr. Shelton, I was relying on him."

He further tells us that the bank's loans amounted to something like $250,000. This witness got his impressions of conditions as to delivery, not from Mr. Bristow, but from Mr. Shelton.

Mr. A. F. Moon, another maker, in direct examination, said:

"Q. In what event was that bond to be used by Mr. Bristow?

"A. In the event our banks got into any worse shape than they were in before this merger could be put through."

And on cross-examination he was asked to restate the conditions under which the bond was executed. His state-

ment is: "I judge from what Mr. Bristow told us, that if we allowed our bank to get into worse condition than it was on the day we signed the bond, then we were bound by that bond and if we did not everything was well and good." And again Bristow said "that he felt like he should ask us gentlemen to give him a bond to be held by him until this arrangement could be completed in order for him to allow the banks to stay open."

As we have seen, Mr. Sanderson signed at a later day. He tells us what he had been led to believe:

"The whole impression was made upon me, was that the bond was given for the proper conduct of the bank officials during the time this thing was pending."

Mr. Arthur Walton another maker, tells us: "I signed the bond thinking it was to protect the bank for the time being. My recollection was that it was to protect the bank from the time we signed the bond until the merger was complete. Never thought of the conditions at all."

Mr. A. H. Turner is the only director who did not sign. He took no part in the negotiations but was present on October 14th. When asked under what conditions it was to be used, answered, "In the event that the bank got into any worse condition from that day until the Louisa negotiations could be closed, as I understood it."

Mr. G. P. Hodgson, replying to the same question, said, "that if the directors did anything between that time and the closing of the negotiations with Louisa to make the bank in worse condition, than it was that day, that the bond would become effective, otherwise it would not."

Mr. Bristow testified that the bond was delivered to him without conditions, although of course it was not to be used if the merger went through, for then there would be no occasion to use it. He was hopeful that the consolidation might be effected but was doubtful because "the Bank of Louisa required a surety bond, with corporate security, which I was certain they could not give."

All the makers appear to have been under the impression that the bond was to cover only such losses as the bank

might suffer between the date of its execution and the termination of negotiations with the Bank of Louisa. Of course this could not affect the terms of the bond itself. It would be a plain violation of the parol evidence rule.

These witnesses, however, differ as to the character of delivery. Some say that it was in escrow to be redelivered to Bristow in the event that the bank suffered loss during said period, and in that event only. The jury must have believed that there was such an agreement for it found for the defendants and their verdict the court approved.

We are not unmindful of the weight which should attach to the judgment.

Bristow demanded that this bond be given and said that if it was not given he would close the bank. The situation in many of its aspects was not unlike that in *White* v. *Commonwealth,* 158 Va. 749, 164 S. E. 375, 376, where the court said:

"The directors, in this instance, were desirous of continuing business, and so at their election they were permitted to do so, provided they were willing to pledge their personal credit. Of course they were not obliged to make any such pledge, but there was no reason why they should not have been permitted to make it, and they did make it in furtherance of what they then believed was their own interest."

The bond there provided:

"Now, therefore, if the obligors herein will indemnify and save harmless all of the depositors of the said Farmers Bank of Oak Hall, Horsey, Virginia, against loss by reason of the liability of the said bank to meet its obligations whenever demand therefor shall be made, then this obligation to be void, otherwise to remain in full force and virtue."

In the instant case is this provision:

"Whereas also the obligors herein being officers and directors of the said The State Bank, and as such, being charged with the administration, management and operation of the said The State Bank, and are desirous of guaranteeing and maintaining the safety and solvency of it, and more especially of indemnifying and saving harmless

its depositors and other creditors, from any loss or damage resulting from the impairment of its capital or any other irregularities as aforesaid."

The bond itself was drafted in the office of the Commissioner of Banking and was enclosed in the letter to Mr. Shelton. Bristow there said that its execution by the directors was a matter for them to decide but that if executed it must be substantially in the shape submitted. That is to say, it must contain provisions for the protection of creditors and depositors although the makers might apportion among themselves the liability incurred. It was executed in the form submitted which we are told is a standard form.

If defendant's contention be sound it gives no protection whatever to creditors and depositors and amounts to no more than a covenant against their own possible misdeeds, for they were, in substance, the bank. In terms it was to protect creditors and depositors.

In such circumstances it is inherently improbable that Mr. Bristow agreed to conditions well calculated to defeat its primary declared purpose. If it be asked, "Why did he have the bond in his possession at all?" the answer is found in his letter: "When executed the bond is to be returned to this office to be held until we feel that the bank's difficulties are over," which is exactly what was done.

Let us, however, assume that this bond was delivered to Bristow under the express condition that it could not be used unless loss by the bank was incurred between October 14th and the time of termination of merger negotiations which negotiations ended on November 29th. And further, that it was to cover only losses suffered by the bank within that period.

If there were any such losses it was to be redelivered to the proper party, who, as we have seen, is Mr. Rhodes, the receiver of the insolvent bank.

Bouvier gives this definition of escrow: "A deed delivered to a stranger to be by him delivered to the

grantee upon the happening of certain conditions, upon which last delivery the transmission of title is complete." Bouv. Law Dict. (Rawle's 3d Ed.) 1072. When there is a second proper delivery, title is complete, just as it would have been had there been in the first instance an unconditional delivery to the grantee.

This provision is now extended to many other written instruments, bonds and notes included. Conditional delivery may be proven by evidence, parol or written, for their terms are not varied by showing that they were not delivered. No bond is binding until there has been a proper delivery. That may be as of its date or it may be deferred and made contingent upon some possibility as yet undetermined, but when delivery is once made the parol evidence rule applies, which is but to say that the date of the delivery does not control the construction of the bond, which must be according to its purport and tenor, and as it would have been had delivery not been delayed.

"The rule which prohibits the admission of parol testimony to vary a deed or other writing is not infringed by the introduction of evidence relating to the delivery of the deed. Such evidence does not tend to contradict the deed or the recitals therein, but merely to show there has been no valid delivery. *Towner* v. *Lucas,* 13 Gratt. [54 Va.] 705." *Nash* v. *Fugate,* 32 Gratt. (73 Va.) 595, 34 Am. Rep. 780.

*Whitaker* v. *Lane,* 128 Va. 317, 104 S. E. 252, 261, 11 A. L. R. 1157, is a case which deals with the conditional delivery of an instrument under seal. There is this statement of the law from *McFarland* v. *Sikes,* 54 Conn. 250, 251-2, 7 Atl. 408, 1 Am. St. Rep. 111:

"Such a contract cannot become a binding obligation until it has been delivered. Its delivery may be absolute or conditional. If the latter, then it does not become a binding obligation until the condition upon which its delivery depends has been fulfilled. If the payee of a note has it in his possession, that fact would be *prima facie* evidence that it has been delivered; but it would be only *prima facie* evi-

dence. The facts could be shown to be otherwise and by parol evidence. Such parol evidence does not contradict the note or seek to vary its terms. It merely goes to its point of non-delivery. The note in its terms is precisely what both the maker and the payee intended it to be. No one desires to vary its terms or to contradict them."

Judge Burks then said:

"In a controversy between the immediate parties to a written instrument, the parol .evidence rule does not forbid the use of parol evidence to establish any fact that does not vary, alter or contradict the terms of the instrument, or the legal effect of the terms used. These are concluded by the writing, and the parties are estopped to deny them."

█ Did the bank suffer loss within said interval of time?

New deposits amounted to $7,348.53. Deposits decreased, however, about $40,000 in the aggregate. Cash on October 14, 1930, was $22,164.69. When the bank closed it had dwindled down to $7,326.12. There was an actual loss in operating expenses from July 1st to December 11th of $4,000. This does not, it is true, cover interest earned but not collected, but if the insolvent bank only pays something like a twenty-five per cent dividend then collections from that source will in no wise cover the cost of operation. Bank loans in gross were somewhere around $250,000. If Mr. Bristow had not closed the bank when he did it would have closed itself in a short time. Matters were rapidly going from bad to worse.

The bond was properly redelivered and upon redelivery became, as we have seen, an obligation enforceable according to its tenor and purport.

It is not necessary that we consider .other assignments of error. They deal with no novel proposition. Upon the merits of the case there should be a judgment for the plaintiff, and it is so ordered.

*Reversed.*

EPES and HUDGINS, JJ., dissenting.

EPES, J., dissenting.

Had I been on the jury I might have found the verdict enunciated by the court in its opinion. But I am of the opinion that there is ample evidence, if believed, to sustain the jury's verdict; and I am not able to say that a governmental official is, *as a matter of law,* so discreet, careful and wise that *"it is inherently improbable"* that he would have accepted a delivery in escrow of the bond here in question upon the conditions testified to by the defendants in error. Also there is in Mr. Bristow's own testimony some statements which tend in some measure to support the testimony of the defendants in error on these points, notwithstanding his categorical statement that it was neither delivered in escrow nor *delivered* upon any condition.

Nor do I concur in the view which the court seems to entertain that any such parol agreement (*i. e.,* the delivery in escrow of the bond accompanied by parol statements of the terms and conditions of escrow testified to by the defendants) violates the terms of the bond itself, and therefore is a violation of the parol evidence rule.

My understanding of the law is that when a bond is delivered in escrow upon a condition (whether parol or written) the terms of the bond cannot speak until the conditions of the escrow have been performed (or performance waived) ; and, therefore, the conditions of the escrow cannot properly be said to violate the terms of the bond, because they have never become effective to be violated.

The plaintiff introduced in evidence the bond which is quoted in the court's opinion, and proved by his own testimony the following facts which are not disputed: The State Bank of Columbia was closed on December 11, 1930, and on December 15, 1930, he was appointed receiver for it. On the day Rhodes was appointed receiver M. E. Bristow, Commissioner of Banking and Insurance for the State of Virginia, sent the bond here sued upon to him by registered mail. At the time the bank was placed in the hands of a receiver it had sustained losses amounting to between

$130,000 and $135,000 which had entirely wiped out its surplus and its capital. Its capital was $20,000. Prior to the institution of this action the plaintiff made demand upon each of the obligors on this bond for the payment thereof, but none of them has paid anything thereon. Between the date of this bond (October 14, 1930) and the time the bank was closed, new depositors made deposits in the bank aggregating $1,600 which had not been drawn out when the bank closed its doors. Including the above items, $7,348.53 was deposited in the bank between October 14th and December 11, 1930, which was not checked out. Outside of anything that may be collected on this bond, the assets of the bank will pay the depositors approximately twenty-five per cent of their deposits. The operating expenses of the bank from October 14th to December 11, 1930, exceeded interest and discounts received by about $4,000; but it does not appear that the operating expenses exceeded interest earned (though not collected) during that time.

When the bond was executed it was delivered to M. E. Bristow, Commissioner of Banking and Insurance for the State of Virginia, by whom it was held until he mailed it to the plaintiff on December 15, 1930.

The testimony of the several defendants relating to whether the bond was delivered in escrow and, if so, the conditions of the escrow, is fairly reflected in the following questions and answers:

Mr. S. W. Shelton, direct examination:

"Q. Tell what Mr. Bristow required or what he did.

"A. Mr. Bristow required the directors of the State Bank to execute a bond in the penalty of $25,000, to be delivered to him, and to be held by him and then used by the bank, if the bank suffered a loss by reason of Mr. Bristow's allowing the bank to remain open for a period of time necessary to consummate these merger proceedings.

"Q. Would he permit you to keep the bank open * * * without some bond?

"A. No.

"Q. What was the understanding and conditions upon which the bond was to be delivered?

"A. To be held by Mr. Bristow to keep the bank open during the negotiations of this merger.

"Q. When did you give the bond to Mr. Bristow?

"A. The day Mr. Sanderson signed it in Mr. Bowles' office (*i. e.*, in the office in Richmond of the Deputy Commissioner of Insurance and Banking, several days after the other obligors had signed it).

"Q. And the bond was given upon the condition that it was not to become effective, except that the bank sustained a loss during the period you have just mentioned (*i. e.*, while negotiations for a merger with the Louisa bank were in progress)."

"A. Never heard anything else attached to it."

S. W. Shelton cross-examination:

"Q. You have testified that this bond was executed and delivered to Mr. Bristow on certain conditions. What did you say these conditions were?

"A. That Mr. Bristow should hold this bond and deliver it to the bank to be enforced if there was any loss during that period that this merger proceeding was pending. He said that we could not keep the bank open without such bond.

"Q. Was that the only condition that was named?

"A. Only condition that I know anything about.

"Q. When was this condition agreed upon and between whom?

"A. It was agreed to between the men who signed the bond and the man we delivered it to. No other condition was ever mentioned, that the bond was required to protect the bank during the time, which the merger could be completed. No other purpose had ever been suggested to me.

"Q. To whom did Mr. Sanderson deliver the bond?

"A. Delivered it to me to be delivered to Mr. Bristow, of course.

"Q. As I understand these conditions to which you have testified were stipulated and agreed upon at Columbia at the time all of you (except Sanderson) signed the bond there?"

"A. I never heard of anything else, except that it was to protect the bank during this period. The purpose was to complete the merger during this period. Mr. Bristow's idea was that there might be a loss during that period and if there was any loss he was to use the bond. If we were going to indemnify the bank we would have delivered it to the officers of the bank.

"Q. As I understand you merely delivered the bond to him (Bristow) in Richmond and at that meeting nothing was said by you to him, at that time?

"A. I don't recall anything. My recollection is that I saw him a moment and handed him the bond in accordance with the agreement we had at Columbia. The facts are that the bond was delivered to him at Columbia. Mr. Sanderson was not there, and Mr. Bristow asked me to take the bond and have it signed by Mr. Sanderson.

"Q. Can you tell us when it was first mentioned in regard to these alleged conditions upon which the bond was delivered or executed?

"A. At the time the bond was first mentioned. I never heard it mentioned under any conditions other than that. I think it was mentioned a week or so before it was given.

"Q. Your recollection is that at the time Mr. Bristow first mentioned requiring the directors to give a bond it was stated at the time that it was to be delivered to him upon the conditions which you have named?

"A. Absolutely the bond was delivered to him to protect the bank during that period.

"Q. Had he agreed to permit you to keep the bank open any particular time?

"A. No. * * * as I remember Mr. Bristow said, 'if you are fortunate and bend every effort you may consummate this merger in thirty days, but I believe it will take sixty or ninety days.' "[1]

Dr. Nash P. Snead, direct examination:

[1] The bond is dated October 14, 1930. The board of directors of the Louisa bank on November 29, 1930, definitely rejected the Columbia bank's proposal to merge. Mr. Bristow closed the Columbia bank on December 11, 1930.

"Q. Were you present at the bank on the day the bond was given?

"A. Yes.

"Q. State what understanding existed at that time with reference to the delivery of this bond or the giving of the bond to Mr. Bristow.

"A. My understanding of it was this: That we were negotiating with the Bank of Louisa to merge with that bank and while these negotiations were going on we gave Mr. Bristow to hold—I expected him to return the bond when he came up and closed the bank.

"Q. In what event was the bond to be used?

"A. In case there was any loss during that period of time."

Dr. Nash P. Snead, cross-examination:

"Q. I understand you to say that you understood that you signed this bond and delivered it to Mr. Bristow to cover any loss which might occur between the date of the signing of the bond and the date of the merger or the closing of the bank?

"A. That is true.

"Q. And you state that no loss occurred, and that if any loss occurred * * * between (during) that period the bond was to be used?

"A. It was given to protect the bank during that period. I think that was the understanding."

When Dr. Snead was called upon by the receiver to pay the bond here in issue, he wrote the receiver, on December 14, 1931, telling him that he was unable to pay the bond, and that he had no property out of which it could be made; but he made no mention of it having been delivered on condition. While he did not admit liability on it, he did not deny that he was liable thereon. He says that he did not make any reference to its having been delivered upon condition, because "it was not necessary, I don't think."

Mr. E. M. Jordon, direct examination:

"Q. State the circumstances under which you signed the bond.

"A. We were negotiating with the Bank of Louisa. I was on that committee, but at this meeting which we signed the bond they had a letter from the Bank of Louisa setting up the terms by which they would take us over. * * * We accepted their terms and after that we signed the bond, simply to take care of any loss that might be sustained during that period of time.

"Q. To whom did you deliver the bond?

"A. To Mr. Bristow.

"Q. What was the condition under which it was delivered to Mr. Bristow?

"A. That if any loss was sustained for the period that it might take to close the deal with Louisa."

Mr. E. M. Jordon, cross-examination:

"Q. What do you mean by that answer? (*i. e.*, the last above quoted.) I don't quite understand just what the meaning of it is.

"A. I mean if the bank sustained any loss, after we gave this bond, between that time and the time we closed with Louisa.

"Q. What would happen in the event of a loss?

"A. The bond was not to be used unless some loss was sustained.

"Q. The bond was not to be used by whom?

"A. Mr. Bristow.

"Q. Can you tell us just exactly what was the agreement between your board and Mr. Bristow with reference to the bond which was executed, if there was any agreement at all?

"A. I have just stated that so far as I know.

"Q. The purpose of the bond was to indemnify the bank in the sum of $25,000 in the event of loss. You said that you understood that the bond was only to be used between the 14th of October and the time the bank merged. I ask you from whom this proposition came, from your bank or Mr. Bristow?

"A. I understood it was agreed on there at the meeting, that was the purpose of the bond.

"Q. I want to know whether this condition was attached and proposed by your board or by Mr. Bristow?

"A. For us to sign that bond, Mr. Bristow. * * * I don't know whether it was Mr. Bristow or the board. That was my understanding.

"Q. Why did you understand that that was to be true?

"A. Mr. Bristow told us that unless we gave this bond he would close the bank on that day. This committee had a communication with the bank at Louisa, making us a proposition, setting forth the conditions under which they would take us over, that was brought before the board meeting and accepted before this bond was signed. Mr. Bristow told us it would take from thirty to sixty days, probably ninety days to close this deal with Louisa, and it was then we gave the bond to him to hold the bank open until the deal could be put over, with the understanding that it would cover any loss that the bank might sustain during that period.

"Q. I asked you though just what this condition was. I asked you whether your board first suggested it or whether Mr. Bristow suggested it, and you testified that Mr. Bristow said that unless you signed the bond he would close the bank that day.

"A. I don't know that he said that day, but it was understood it would be closed.

"Q. Did you have any written agreement as to the delivery of that bond or the taking effect other than as set out in the bond itself?

"A. We had no written agreement.

"Q. Have any oral agreement?

"A. I think so. That is my understanding of it.

"Q. Did Mr. Bristow tell you that the bond was not to be delivered unless a loss was sustained?

"A. I don't know that he did.

"Q. Did you tell him so? You did not tell him the bond was only to be effective upon the happening of that condition?

"A. I could not say who said it or how it was brought about, I can only tell you my understanding of it."

He then testified that Mr. Bristow was in the board meeting for a part of the time, but that he thinks he was absent a part of the time during the meeting.

Mr. E. M. Jordon, redirect examination:

"Q. Mr. Crank asked you about this understanding with Mr. Bristow. Did you get your information from any other source than from that meeting there that day? * * * Did you get your understanding about the condition that the bond was given there that day?

"A. Yes."

Mr. P. N. Stoneman, direct examination:

"Q. Did you see Mr. Bristow there that day (the day the bond was signed by him)?

"A. Yes.

"Q. Who carried on those negotiations on the part of the directors?

"A. Mr. W. S. Shelton.

"Q. What was the condition that the bond was signed and turned over to Mr. Bristow on that day?

"A. Being further from the bank, I got most of my information through Mr. Shelton. What led up to the signing of the bond was this. We were negotiating to merge the two banks * * * and I was relying on Mr. Shelton to give us all the information that I know regarding it.

"Q. On the day that you signed the bond what were the circumstances or the conditions that the bond was given to Mr. Bristow? What was the event in which it was to be used?

"A. That bond was given that day pending the merger with Louisa and as a director, all of the directors, we accepted the offer Louisa made. Under those conditions I agreed to sign the bond.

"Q. What were the conditions under which this bond was to be used?

"A. I understood that it was to save the bank harmless during this period.

"Q. Suppose the bank suffered no loss during * * * the period the negotiations were pending, what was to become of the bond?

"A. The bond was to become null and void and be returned, the only answer I could give."

Mr. P. N. Stoneman, cross-examination:

"Q. To get back to this condition upon which this bond was signed, what did you say the condition was?

"A. To save the bank harmless until we could complete the merger with the Bank of Louisa.

"Q. Suppose the merger of the bank went through, what was going to happen?

"A. The bond was to be returned.

"Q. Suppose it did not what was going to happen to the bond?

"A. As I stated, if the bank was saved harmless the bond would be returned.

"Q. Did Mr. Bristow ever tell you, as a signer of the bond, that if the merger did not go through the bond was to be returned to you?

"A. That is what I inferred.

"Q. You won't state that he made that statement to the board of directors?

"A. No.

"Q. Where did you get the understanding from then?

"A. I got it through discussions in the meeting.

"Q. With whom?

"A. Mr. Shelton, I was relying on him."

Mr. A. F. Moon, direct examination:

"Q. How long did Mr. Bristow remain up there with you on that day (i. e., in the meeting of the board the day the bond was signed).

"A. I think Mr. Bristow stayed there until the meeting was over. I won't be absolutely sure.

"Q. Was the bond signed while Mr. Bristow was there?

"A. Yes, sir, all but Mr. Sanderson.

"Q. Was Mr. Bristow present when the discussions were had with reference to the bond?

"A. Yes, sir. He was present at some of them.

"Q. Was there any discussion there in Mr. Bristow's presence as to how long it would take to complete these merger proceedings?

"A. I remember Mr. Bristow saying that he was glad we had accepted the Louisa proposition, but that we would find that it would take longer than we thought to complete it; that in his opinion it would take from thirty to sixty days and may be ninety days to complete it, and that he was mighty glad that we had taken that step, but that he felt like he should ask us gentlemen to give him a bond to be held by him until this arrangement could be completed in order for him to allow the bank to stay open. * * * We signed the bond afterwards.

"Q. Did you give the bond to him or the bank?

"A. We gave the bond to Mr. Bristow, I think, and later he gave it to Mr. Shelton to get Mr. Sanderson's signature.

"Q. In what event was that bond to be used by Mr. Bristow?

"A. In the event our bank got in any worse shape than they were in before this merger could be put through."

Mr. A. F. Moon, cross-examination:

"Q. Just exactly what was the condition under which you signed that bond. I am not talking about any one else now, but what conditions did you sign it under?

"A. The condition under which I signed the bond was that we were not to allow our bank to get in any worse condition, as Mr. Bristow said, than it was before this merger went through.

"Q. What do you mean by that, any worse condition? Your version is a little different from the others, and I cannot gather what you mean.

"A. I mean that * * * I judge from what Mr. Bristow told us, that if we allowed our bank to get in any worse condition than it was on the day we signed the bond, then we were bound by that bond, and if we did not everything was well and good.

"Q. Mr. Bristow tell you that himself?

"A. He made that statement in that room.

"Q. Who was present?

"A. Everyone who was in the meeting.

"Q. You tell the jury that he made that statement?

"A. That was my understanding, as near as I can get at his exact words.

"Q. He closed you up on December 11, 1930, did he not? You must have been in worse condition, were you not?

"A. I don't think we were. He told us that if you gentlemen don't allow the bank to get in any worse shape than it was from the time the bond was given and the merger was completed. We had all faith that the merger was going through."

Mr. C. R. Sanderson was not present at the meeting at which the others signed the bond. He signed it a few days later in Richmond in the office of the Deputy Commissioner of Banking and Insurance at a time (or as he calls it a meeting) when Mr. Bristow was also present a part of the time.

Mr. Shelton and several others of the directors of the bank were present. On direct examination he testified:

"Q. What was the understanding and condition that this bond was signed by you and given to Mr. Bristow?

"A. The information I got and the understanding I had. It was discussed generally at the meeting and I think Mr. Bristow was present part of the time. My understanding was we had to give the bond to continue in operation until we merged with Louisa. I looked upon it as a bond for the future conduct of the business, and not what we had done.

"Q. In what event was the bond to be used?

"A. In the event of any bad loans and bad management of the bank.

"Q. In case the bank sustained no loss during the period, what was he to do with the bond?

"A. I thought it was void.

"Q. Was that your understanding when you signed the bond and passed it over to him?

"A. Would not have signed it otherwise."

Mr. C. S. Sanderson, cross-examination:

"Q. Who was it that was talking about the bond (in the meeting in Richmond he had mentioned)?

"A. It was discussed among all of us there in the room and Mr. Bristow was present part of the time.

"Q. Did this discussion take place before you signed the bond?

"A. Both before and after.

"Q. Did Mr. Bristow tell you for what purpose the bond was given to him?

"A. It was discussed in the room, I don't know whether he discussed the matter personally or not.

"Q. Did Mr. Bristow ever discuss the conditions of the bond with you?

"A. He was asking that the bond be given and that unless it was given he would close the bank.

"Q. Do you recall anything else that he said about the bond?

"A. No, sir. I do not, that was the general impression made upon me by all the directors and Mr. Bristow, that he had to protect the State until this merger was completed or not completed whichever the case might be. I don't know what would happen to the bond if the merger had gone through.

"Q. Nothing was said about that one way or the other?

"A. I don't recall it.

"Q. Was there anything said about what would happen to the bond if the merger went through?

"A. If the bank lost anything we would have been liable. I don't recall anything else.

"Q. Was there any agreement between you or between the directors and Mr. Bristow in regard to any condition upon which the bond was to become effective?

"A. The whole impression made upon me was that the bond was given for the proper conduct of the bank officials during the time this thing was pending."

Mr. Arthur Walton, direct examination:

"Q. Did Mr. Bristow come before your board (when you were present) and discuss the matter of this bond?

"A. Yes.

"Q. Tell upon what conditions this bond was delivered to Mr. Bristow, in what event the bond was to be used?

"A. I signed the bond thinking it was to protect the bank for the time being. My recollection was that it was to protect the bank from the time we signed the bond until the merger was complete. Never thought of the conditions at all.

"Q. When you delivered or gave the bond to Mr. Bristow in what event, or under what circumstances was it that he was to use the bond or turn it over to the bank?

"A. In case anything went wrong with the bank before the time it was given and the bank closed or taken over, the bank was taken over I should have said."

Mr. A. H. Turner was a director of the bank. He was present at the meeting at which the obligors (other than Sanderson) signed the bond, but did not sign it himself. On direct examination he testified:

"Q. State just what conditions, if any, upon which this bond was delivered or in what event or circumstances the bond was to be used by Mr. Bristow?

"A. * * * What I understood from this meeting was that there was a merger with these banks[2] and the Louisa bank. This bond was prepared and the directors signed it that evening for an amount of $25,000, I think.

"Q. Now in what event or under what circumstances was this bond to be used?

"A. In the event that the bank got in any worse condition from that day until the Louisa negotiations could be closed, as I understood it.

"Q. Was Mr. Bristow there that day?

"A. Yes, sir.

"Q. Did he make any statement with reference to the time it would take to complete these (merger) proceedings, and if so what?

"A. Mr. Bristow said according to his judgment it would

[2] The Bank of Columbia had a branch.

take from thirty to sixty and probably ninety days to complete the merger.

"Q. Did he at any time express or intimate any opinion on his part that no such merger could be effected?

"A. No, sir. * * * Talked very favorably from what I understood. It did not seem to be any doubt in his mind."[3]

Mr. A. H. Turner, cross-examination:

"Q. I understood you to say that bond was given upon the condition that if the bank did not get in any worse condition before the negotiations for the merger terminated that the bond was not to be effective?

"A. I don't think I said that. The object of this bond was given to secure them while the merger was in progress.

"Q. To secure whom?

"A. The bank.

"Q. Who said that?

"A. That was said among the directors. I did not talk to Mr. Bristow.

"Q. You won't tell the jury that Mr. Bristow said that?

"A. No, sir."

Mr. G. P. Hodgson, direct examination:

"Q. When that bond was signed and delivered to Mr. Bristow in what event was it to be used?

"A. That if the directors did anything between that time and the closing of the negotiations with Louisa to make the bank in worse condition than it was that day, that the bond would become effective, otherwise it would not.

"Q. Mr. Bristow testified here that he considered he was getting an outright contribution of $25,000 to the bank. Did he say anything about that, that day?

"A. Never heard anything about it.

"Q. Did you have any conversation with Mr. Bristow as to what would become of the bond if the merger did not go through?

"A. I asked him what he was going to do. He said he would return it.

---

[3] The other defendants also testify to this same effect.

"Q. Did you ask him what would happen if the merger did not go through?

"A. I did not ask him that because, there was no doubt in my mind that the merger would become effective.

"Q. What was the understanding of what would become of the bond if the merger did not go through?

"A. My understanding was that it would not be effective."

Mr. G. P. Hodgson, cross-examination:

"Q. You have stated * * * the condition upon which this bond was delivered, you have stated your understanding at the time the bond was given. What did you state? I will let you state it again.

"A. That if the board of directors did anything to bring about a worse condition during the period from the date of the bond and the closing of the bank or merger with the Louisa bank.

"Q. Who told you that?

"A. I don't know that anyone told me that directly. That is the impression I got at this meeting.

"Q. You won't state that Mr. Bristow said that?

"A. No, sir. Made that impression, but I won't say that he said that.

"Q. And you cannot name anyone else who told you that?

"A. No, sir.

"Q. All you can say is that is your impression, and that is your opinion?

"A. That is the reason I signed the bond, because I was so sure the merger would go through."

A number of the witnesses testify that the bank was certainly in as good, if not better, shape when it was closed as it was on the day the bond was signed; and the evidence is, I think, wholly insufficient to support a verdict predicated upon a finding that the *bank* sustained any loss during the period intervening between the date of the bond and the time it was closed.

The plaintiff introduced M. E. Bristow in rebuttal, who testified as follows:

"Q. State to the jury, Mr. Bristow, whether there were

any conditions attached, agreed upon between you and the directors of the bank at that time (*i. e.,* when the bond was signed and given to him) which were not set forth in the bond?

"A. No, sir. The bond set forth the terms under which it was taken.

"Q. Were any conditions given or agreed upon or anything that had to happen before the bond was to become operative?

"A. No, sir. I considered there was a deficiency in the assets there of $25,000 to $50,000. I don't think the directors agreed with me, and therefore, I agreed to a bond for $25,000.

\*     \*     \*     \*     \*     \*     \*     \*

"Q. Was there any agreement or understanding between you and the directors of said bank that this bond was only to become operative in the event of a loss sustained by the bank between October 14th and the date the bank was closed, or the date the bank merged with the Bank of Louisa, or was abandoned?

"A. No, sir. I believed the bank's capital was impaired or in danger of being impaired as set out in the bond itself.

"Q. Would you have taken the bond with any such verbal agreement attached to it?

"A. No, sir. I took it according to its own terms. I had no idea of holding it in escrow.

\*     \*     \*     \*     \*     \*     \*     \*

"Q. You would have closed it (the bank) if they had not given the bond?

"A. Yes, sir.

"Q. Under any bond that was given some loss would have to take place before the bond would become operative, would it not?

"A. Under any bond the bond would have to be breached before it became operative, but I considered the bond a part of the assets of the bank.

"Q. You don't mean to tell the jury and court that these

gentlemen were to pay this bank $25,000 as a contribution to the bank, unconditionally?

"A. Yes, sir, read the bond itself.

\*   \*   \*   \*   \*   \*   \*   \*

"Q. If that were a contribution to the capital assets of the bank, why did you state that this bond was to be returned to this (your) office and held until the bank's difficulty is over?[4]

"A. That is the way I interpreted the bond. If they got the bank back on its feet then I would return the bond, if they were to put $25,000 in the bank's vault it would have been right hard for me to take it out and hand it back to them.

\*   \*   \*   \*   \*   \*   \*   \*

"Q. Suppose the merger had taken place, what did you propose to do with that bond?

"A. In that case I should have regarded the depositors as properly protected and returned the bond.

"Q. Then it was not an outright contribution?

"A. I regarded it as an indemnifying bond to protect the bank until it had overcome its difficulties."

While the testimony of the defendants differs somewhat as to the terms upon which the bond was delivered to Mr. Bristow, I am not able to say that the evidence is, *as a matter of law,* insufficient to support a verdict predicated upon a finding that this bond was delivered to Mr. Bristow in escrow upon condition that it should be delivered to the bank only in the event of a loss sustained by the *bank* during the period intervening between the date of the execution of the bond and the date of its merger with the Bank of Louisa or the date of the closing of the bank, and that this condition has not been fulfilled. The jury by its verdict has so found, and the trial judge has refused to set its verdict aside. Under the rules of law pertaining in this jurisdiction it should not be disturbed.

---

[4] On October 11, 1930, Mr. Bristow had written to Mr. S. W. Shelton the letter quoted in the opinion of the court.

In *Ballard* v. *Com.*, 156 Va. 980, 991, 159 S. E. 222, 225, Mr. Justice Holt speaking for the court said:

"We have here a jury's verdict, approved by an able and unbiased judge. Such a verdict should not be set aside in this court merely because, as an original proposition, we might have reached a different conclusion. We sit as an appellate court and not as a jury.

"The appellate court will not be justified in granting a new trial, even if its members should think that if they had been on the jury they might have found a different verdict."

In *Richmond-Washington Motor Coaches* v. *Austin,* 154 Va. 148, 152, 152 S. E. 357, 358, Mr. Justice Campbell speaking for the court quoted with approval the language of Judge Buchanan in *Southern Ry. Co.* v. *Cash,* 110 Va. 284, 65 S. E. 601:

"The court cannot invade the province of the jury on a motion for a new trial, by attempting to pass upon the credibility of the witnesses, to reconcile conflicting statements, or to determine the weight to be given the evidence of each. If there are conflicts or discrepancies in the evidence it is the jury's province to reconcile them if possible, and, if not, the jury may give credence to the witness or witnesses who in their opinion are best entitled to it."

In this connection it is to be noted that the terms of the escrow to which the witnesses testify is not that the bond should be delivered if "any *depositor,* or depositors, of the State Bank sustained any loss by reason of the bank remaining open for business"; but that it should be delivered only in the event of a loss sustained by the *bank.* Of course persons making deposits after October 14th, which they did not withdraw, suffered loss by the bank remaining open, for if it had been closed they would have deposited their money elsewhere, but this is very different from the *bank's* suffering a loss.

Instruction No. 3 as asked for by the plaintiff read:

"The court instructs the jury that the burden is upon the defendants to prove by a preponderance of the evidence that the bond sued upon was delivered to Mr. Bristow, with

the *express* agreement that said bond was to become binding upon the signers thereof, only in event that a loss was sustained by the said bank between the date of the execution of the said bond and the date of the termination of the merger negotiations between The State Bank and The Bank of Louisa, *and the burden is also upon the defendants to prove that no loss occurred during said period,* and that such evidence must be clear, unequivocal and convincing." (Italics ours.)

Over the objection of the plaintiff the court struck out the italicized words, and gave the instruction as so amended.

The fourth assignment of error is that the court erred in striking out the italicized words, and in giving the instruction as thus amended.

I think the court did not err in striking out either the word "express" or the clause with reference to the burden of proof.

A delivery upon escrow may arise from, and the terms and conditions of the escrow be fixed by the acceptance of the delivery of an instrument under facts and circumstances, known to the acceptor of the delivery, which show that the deliverer intended to deliver it only in escrow and the terms and conditions of the escrow upon which he intended to deliver it.

My view with reference to the burden of proof is this: Where the depository of a bond alleged to have been held in escrow, who has made delivery thereof to the obligee, denies that he held it in escrow, and testifies that he delivered it without reference to whether the terms of the alleged escrow have been complied with or not, the burden rests upon the party seeking to establish the escrow to prove that it was delivered in escrow; but when this has been proven, the burden rests upon the obligee in possession thereof to establish that the terms of the escrow have been complied with. Under such circumstances no presumption arises from the possession of the instrument that it was validly delivered. See on this subject 21 C. J. par. 43, pp.

894-5; *Black* v. *Shreve,* 13 N. J. Eq. 455, 459; *Cogswell* v. *O'Connor,* 13 N. S. 513.

There are some other assignments of error, but I think none of them are well made.

My view is that the judgment of the trial court should be affirmed.